IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ARTHUR TORRES,[1]

       Plaintiff,

    vs.                                           Civ. No. 15-153  KK

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

       Defendant.

## MEMORANDUM OPINION AND ORDER[2]

    **THIS MATTER** is before the Court on Plaintiff's Motion to Reverse and Remand for Rehearing, With Supporting Memorandum ("Motion"), filed on November 9, 2015.  (Doc. 22.) The Commissioner of Social Security ("Commissioner") filed a Response on February 19, 2016 (Doc. 34), and Plaintiff filed a Reply on March 4, 2016.  (Doc. 35.)  Having meticulously reviewed the entire record and being fully advised in the premises, the Court finds the Motion is not well taken and is **DENIED.**

## I.  Standard of Review

    Judicial review in a Social Security appeal is limited in scope by 42 U.S.C. § 405(g) to two inquiries: first, whether substantial evidence supports the Commissioner's final decision[3]; and second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d

---

[1] Yvonne M. Torres was the claimant seeking disability insurance benefits; however, she passed away on October 7, 2015, while this action was pending.  (Doc. 27-3.)  On December 14, 2015, the Court entered an Order Substituting Party and substituted her husband, Arthur Torres, as the party in this case.  (Doc. 28.)  The Court will, however, refer to Ms. Torres as the claimant throughout this Memorandum Opinion and Order.

[2]  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 4, 12, 13.)

[3] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision.  20 C.F.R. §§ 404.981, 416.1481.  This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision.

1208, 1214 (10th Cir. 2004) (quotation omitted). If substantial evidence supports the Commissioner's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted). Courts must meticulously examine the entire record, but may neither reweigh the evidence nor substitute their judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* While the court may not reweigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. Fed. Aviation Admin.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II.  Applicable Law and Sequential Evaluation Process

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if her "physical or

mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). To qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show that: (1) she is not engaged in "substantial gainful activity"; *and* (2) she has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) her impairment(s) meet or equal one of the Listings[4] of presumptively disabling impairments; *or* (4) she is unable to perform her "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *Grogan* 399 F.3d at 1261. If the claimant cannot show that her impairment meets or equals a Listing, but she proves that she is unable to perform her "past relevant work," the burden of proof then shifts to the Commissioner, at step five, to show that the claimant is able to perform other work in the national economy, considering her residual functional capacity ("RFC"), age, education, and work experience. *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a Social Security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing

---

[4] 20 C.F.R. pt. 404, subpt. P. app. 1.

3

consistent with the issues raised." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006). "This is true despite the presence of counsel." *Henrie*, 13 F.3d at 361. "The duty is one of inquiry and factual development," *id.*, "to fully and fairly develop the record as to material issues." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997). This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination. *Madrid*, 447 F.3d at 791-92. The duty is triggered by "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Hawkins*, 113 F.3d at 1167.

### III. Background and Procedural Record

Claimant Yvonne Torres ("Ms. Torres") was born on April 13, 1952. (Tr. 142.[5]) Ms. Torres completed two years of college. (Tr. 152.) Ms. Torres worked as a manager for Qwest Corporation from 1970 until she retired in 2000. (Tr. 178, 601-02.)

On April 16, 2009, Ms. Torres protectively filed[6] an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401. (Tr. 116-119, 142-153.) Ms. Torres alleged a disability onset date of December 1, 2005, because of sleep apnea, fibromyalgia, and torn meniscus (right knee). (Tr. 146.) Ms. Torres did not

---

[5] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 17) that was lodged with the Court on August 10, 2015.

[6] Protective Filing Status is achieved once an individual contacts the Social Security Administration with the positive stated intent of filing for Social Security Disability benefits. The initial contact date is considered a claimant's application date, even if it is earlier than the date on which the Social Security Administration actually receives the completed and signed application. *See* 20 C.F.R. §§ 404.614, 404.630, 416.325, 416.340, 416.345.

engage in substantial gainful activity since her alleged disability onset date.   (Tr. 579.)
Ms. Torres' date of last insured was December 31, 2005.[7]   (*Id.*)

Ms. Torres' application for DIB was initially denied on June 26, 2009.  (Tr. 59, 61-64.)
Ms. Torres' application was denied again at reconsideration on February 1, 2010.  (Tr. 60, 70-
72.)  On March 1, 2010, Ms. Torres requested a hearing before an Administrative Law Judge
("ALJ").   (Tr. 75-76.)   The ALJ conducted a hearing on December 8, 2010.   (Tr. 33-58.)
Ms. Torres appeared in person at the hearing with her non-attorney representative Aurelio
Gallardo.[8]   (*Id.*, Tr. 66, 68)   The ALJ took testimony from Ms. Torres (Tr. 52-71) and an
impartial vocational expert ("VE"), Judith Beard.  (Tr. 71-76.)

On January 25, 2011, the ALJ issued an unfavorable decision.  (Tr. 17-28.)  The ALJ
found Ms. Torres not disabled at step five of the five-step sequential evaluation process, and
determined that, "considering the claimant's age, education, work experience, and residual
functional capacity, she had acquired work skills from past relevant work that were transferable
to other occupations with jobs existing in significant numbers in the national economy[.]"
(Tr. 27.)  On March 30, 2012, the Appeals Council issued its decision denying Ms. Torres'
request for review and upholding the ALJ's final decision.  (Tr. 4-8.)

On May 29, 2012, Ms. Torres timely filed a Complaint seeking judicial review of the
Commissioner's final decision.  (USDC Civ. No. 12-581 LH/KBM; Doc. 1.)  On February 5,
2013, District Judge LeRoy Hansen, upon consideration of Defendant's Unopposed Motion to
Reverse and Remand, entered an Order remanding the case to the Commissioner for further
administrative proceedings.  (*Id.*; Doc. 20.)  Judge Hansen's Order provided that

---

[7] To receive benefits, Ms. Torres must show she was disabled prior to her date of last insured.  *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1347 (10th Cir. 1990).

[8] Ms. Torres is represented in this proceeding by Attorney Michael Armstrong.  (Tr. 667-79.)

> [u]pon remand, the ALJ will provide Plaintiff an opportunity for a new hearing
> and a new decision, for the Administrative Law Judge to clarify the Plaintiff's
> residual functional capacity during the period at issue, and to obtain testimony
> from a vocational expert concerning whether the Plaintiff had acquired skills from
> her past relevant work that were readily transferable to other work within her
> residual functional capacity to perform during the period at issue.

(*Id*.)   On April 12, 2013, the Appeals Council issued an Order Remanding Case to

Administrative Law Judge pursuant to Judge Hansen's Order.  (Tr. 635-636.)

The ALJ conducted a second hearing on August 27, 2014.  (Tr. 595-632.)  Ms. Torres

appeared in person at the hearing with her attorney Michael Armstrong.  (*Id*.)  The ALJ took

testimony from Ms. Torres (Tr. 601-21), from Denise Ramona Sanchez (Ms. Torres' sister)

(Tr. 621-28), and an impartial vocational expert ("VE"), Nicole B. King.  (Tr. 628-31.)

On November 26, 2014, the ALJ issued a "Notice of Decision – Unfavorable."  (Tr. 573-

88.)  At step one, she found that Ms. Torres had not engaged in substantial gainful activity since

her alleged onset date.  (Tr. 579.)  Because Ms. Torres had not engaged in substantial gainful

activity for at least twelve months, the ALJ proceeded to step two and found that Ms. Torres

suffered from severe impairments of plantar fasciitis, asthma, and obesity.  (*Id.*)  The ALJ also

determined that Ms. Torres suffered from nonsevere impairments of hepatitis C and dysthymia.

(*Id.*)  At step three, the ALJ concluded that through the date last insured, Ms. Torres did not have

an impairment or combination of impairments that met or medically equaled one of the listed

impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id*.)

Because she found that Ms. Torres' impairments did not meet a Listing, the ALJ went on

to assess Ms. Torres' RFC, which is used to evaluate the claim at both step four and step five.  20

C.F.R. §§ 404.1520(a)(4), 404.1520 (e, f, g).   The ALJ stated that

> [a]fter careful consideration of the entire record, I find that through the date last
> insured, the claimant had the residual functional capacity to perform sedentary
> work as defined in 20 CFR 404.1567(a), meaning that she could lift 10 pounds

occasionally; sit for at least 6 hours in an 8 hour day; and stand or walk intermittently up to 2 hours in an 8 hour day; but that she should have avoided exposure to pulmonary irritants including dust, fumes, odors, and gases.

(Tr. 582.)  The ALJ concluded that Ms. Torres was not capable of performing her past relevant work and proceeded to step five.  (Tr. 586.)  At step five, the ALJ determined that Ms. Torres had acquired work skills from her past relevant work that were transferrable to other occupations, and that considering her age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy she could perform.   (Tr. 587.)  Relying on VE testimony, the ALJ determined that Ms. Torres could perform occupations such as scheduling clerk, registration clerk, or reservation clerk.  (*Id.*)

Because this case had already been remanded following judicial review, Ms. Torres timely filed the instant action, rather than requesting review by the Appeals Council, as permitted by 20 C.F.R. §§ 416.984(d), 416.1484(d).  (Doc. 1.)

## IV.  Analysis

Ms. Torres asserts three arguments in support of reversing and remanding her case, as follows: (1) ALJ Farris failed to accord the proper weight to treating physician Joseph Aragon, M.D., as required by SSR 96-2p; (2) ALJ Farris failed to pose a hypothetical to the VE that contained all of Ms. Torres' restrictions as required by SSR 96-8p and then relied on the VE's testimony in assessing Ms. Torres' RFC; and (3) ALJ Farris' past relevant work analysis was erroneous resulting in further error in her finding of transferrable skills.  (Doc. 22 at 14.)  For the reasons discussed below, Ms. Torres' motion will be denied.

### A.   Medical History

On May 30, 2009, Ms. Torres initially reported to Social Security that sleep apnea, fibromyalgia, and a torn meniscus (right knee) limited her ability to work.  (Tr. 146.)   On

September 10, 2009, Ms. Torres reported that her condition had worsened due to (1) mono, which occurred around June 3, 2009; (2) an inability to handle stress or use her knees or left hand, which occurred around March 31, 2009; and (3) chronic fatigue, which occurred around February 4, 2009.  (Tr. 155.)  On March 1, 2010, Ms. Torres reported that her condition had worsened due to her "depression [] hitting harder" beginning around October 2009.  (Tr. 169.) Subsequent to her reports to Social Security, Ms. Torres alleged through correspondence, her attorney representative, and testimony that a number of other medical problems also limited her ability to work.  (Tr. 43-44, 48-49, 179, 181, 603-21, 802-03.)  Specifically, Ms. Torres alleged morphea, temporomandibular joint disorder, fibromyalgia, sleep apnea, rheumatoid arthritis, chronic fatigue syndrome, lupus, plantar fasciitis, hepatitis C, restless leg syndrome, asthma, anxiety and depression, learning disability, torn meniscus (right knee), left shoulder bursitis, merca [sic], mitral valve disorder, bladder spasms, acid reflux, ulcer, varicose veins, glaucoma, cataracts, and iritis.  (Tr. 43-44, 48-49, 179, 181, 603-21, 802-03.)  The Court will discuss each in turn.

### 1.    Morphea[9]

On September 1, 2010, Ms. Torres presented to dermatologist Robert Walters, M.D., as a new patient for evaluation of skin lesions located on her face, ear and neck.  (Tr. 559-60.) Dr. Walters assessed dermatosis of uncertain etiology, but suspected linear morphea.  (*Id.*)  He recommended a punch biopsy from each of the affected sites.  (*Id.*)  On September 15, 2010, Dr. Walters indicated that Ms. Torres had morphea "with some areas which are mostly just depigmented and some areas which have textural changes."  (Tr. 558.)  Dr. Walters referred

---

[9]  Morphea is a rare skin condition that causes painless, discolored patches on your skin. http://www.mayoclinic.org/diseases-conditions/morphea/basics/definition/con-20028397.

Ms. Torres to ophthalmologist Dr. Chiu to assess any ocular involvement,[10] and to rheumatologist Dr. Peisajovich to assess any pansclerotic involvement.   (*Id*.)   Dr. Walters prescribed Protopic ointment, and advised Ms. Torres to return in three months.  (*Id*.)

On September 20, 2010, Ms. Torres saw Andres Peisajovich, M.D., of the Presbyterian Medical Group Rheumatology.  (Tr. 548-50.)  Dr. Peisajovich assessed that Ms. Torres did not have any evidence of systemic scleroderma and did not want to prescribe any systemic immunosuppression medication.   (*Id*.)   Dr. Peisajovich repeated an autoimmune screen and added more serology studies.  (*Id*.)  On October 4, 2010, Dr. Peisajovich informed Ms. Torres that based on the additional laboratory studies, her morphea diagnosis did not represent systemic scleroderma, lupus, or any other systemic autoimmune disorder.   (Tr. 546-47.)   As such, Dr. Peisajovich did not prescribe any immunosuppression medication and advised Ms. Torres that he wanted to treat her conservatively.  (*Id.*)  On February 23, 2011, Dr. Peisajovich saw Ms. Torres in follow up and assessed that she appeared to be stable, that her rash was getting better, and that she did not have the hard skin as before.  (Tr. 1022-23.)  Dr. Peisajovich ordered a pulmonary function test and transthoracic echocardiogram to evaluate for pulmonary hypertension.  (*Id*.)  On March 1, 2012, Dr. Ruby G. Bendersky assessed that Ms. Torres had no evidence of pericarditis or pericardial disease, had good left ventricular function, and a normal Holter monitor with no significant arrhythmias noted.  (Tr. 1144-49.)

On December 11, 2013, Ms. Torres saw Scott Stoerner, M.D., of Albuquerque Center for Rheumatology, for follow up on blood work and complaints of right knee effusion and pain. (Tr. 985-90.)  Dr. Stoerner noted that Ms. Torres had a "[h]istory of generalized morphea with no evidence of systemic scleroderma with negative pulmonary workup in the past[.]"  (Tr. 989.) Dr. Stoerner stated he did not have any evidence that Ms. Torres' right knee pain was related to

---

[10] The medical record evidence does not contain any records from Ophthalmologist Dr. Chiu.

her underlying generalized morphea.   (*Id.*)   On April 24, 2014, Dr. Stoerner noted that Ms. Torres' morphea was localized with no further progression of scleroderma.  (Tr. 975.)

### 2.   Temporomandibular Joint Disorder

Dr. Jeff Jaramillo referred Ms. Torres to Dr. Daniel Clifford, DDS for evaluation and treatment of temporomandibular joint ("TMJ") symptoms she experienced following her involvement in a motor vehicle accident on July 8, 1999.   (Tr. 362-63, 364.)   Following Dr. Clifford's physical and radiographic examinations on October 19, 1999, he diagnosed "524.63 Internal Derangement of the right TM joint; 525.60 Unspecified Disorder of the left TM joint; 526.40 Inflammatory Condition of the left TM joint; 723.10 Cervicalgia; 784.00 Cephalgia; 729.10 Myospasm."   (Tr. 224, 362-63.) Dr. Clifford treated Ms. Torres with an orthotic appliance and trigger point injections.   (Tr. 363.)   Ms. Torres had five follow-up appointments with Daniel Clifford following her initial post-motor vehicle accident evaluation. (Tr. 357-61.)  At her final appointment on March 8, 2000, Ms. Torres reported that since she had started treatment with Daniel Clifford, she had improved 65-70%.  (Tr. 357.)

On August 12, 2008, Dr. Clifford reported to Dr. Richard Seligman,[11] *inter alia*, that Ms. Torres suffered from TMJ disc disorder.  (Tr. 338.)

On October 8, 2008, Dr. Joseph Aragon[12] referred Ms. Torres to Dr. Clifford for complaints of jaw pain, neck pain, headaches, and shoulder pain.  (Tr. 315, 318.)   Dr. Clifford represented in his Medical Assessment of Temporomandibular Joint Disorder that he last saw Ms. Torres on November 23, 2009, for a TMJ splint adjustment.  (Tr. 1120.)

---

[11] Dr. Seligman had referred Ms. Torres to Dr. Clifford to treat sleep apnea.  (Tr. 336-38.)  Dr. Clifford included this diagnosis as part of his sleep apnea report to Dr. Seligman.  (*Id.*)

[12] Dr. Joseph Aragon was Ms. Torres' primary care physician.  The record contains his treatment notes beginning in October 1984.  (Tr. 212.)  Ms. Torres also testified that Dr. Aragon had been her primary care physician for 30 to 35 years.  (Tr. 45.)

### 3.      Sleep Apnea

On October 19, 1999, Daniel Clifford, DDS observed as part of his TMJ evaluation that Ms. Torres may have upper airway disturbance or obstructive sleep apnea and recommended she follow up with Dr. Aragon to discuss a referral for a formal sleep study.  (Tr. 363.)  There is no evidence in the record that Dr. Aragon referred Ms. Torres for a formal sleep study or that a formal sleep study was performed at that time.

On May 5, 2008, Drs. Aragon and Clifford referred Ms. Torres to the Kaseman-Presbyterian Sleep Disorders Center for evaluation of obstructive sleep apnea.  (Tr. 379-82.) Based on Ms. Torres' reported history and examination, Bettina V. Pangan, CFNP, recommended a sleep study.  (*Id.*)  On May 7, 2008, Ms. Torres attended a diagnostic sleep study.  (Tr. 377-78.)  Dr. Seligman assessed moderate obstructive sleep apnea and recommended a restudy for purposes of positive airways pressure titration.  (*Id.*)  On June 28, 2008, Ms. Torres attended a second sleep study, and Dr. Seligman assessed Ms. Torres with moderate obstructive sleep apnea syndrome and recommended CPAP therapy.  (Tr. 375-76.)  Dr. Seligman referred Ms. Torres to Dr. Clifford for sleep apnea treatment.  (Tr. 336-38.)   On October 4, 2010, Dr. Peisajovich, encouraged Ms. Torres to be compliant with her CPAP.  (Tr. 1025.)

### 4.      Fibromyalgia

On February 24, 2010, Ms. Torres presented to Dr. Aragon and complained of depression. (Tr. 953.)   Dr. Aragon diagnosed Ms. Torres on that date with, *inter alia*, fibromyalgia.  (*Id.*)  Dr. Peisajovich's October 4, 2010, records note that Ms. Torres had evidence of fibromyalgia for which she was currently taking Cymbalta.[13] (Tr. 1025.) Dr. Aragon diagnosed fibromyalgia again on March 23, 2011, and January 12, 2012.  (Tr. 928, 936.)

---

[13] In June 2008 the FDA approved Cymbalta for the treatment of fibromyalgia in adults.  *See* www.fda.gov.For Consumers/ConsumerUpdates/ucm107802.htm; www.drugs.com/history/cymbalta.html.  Prior to that, the FDA had

There is no evidence in the record that any qualified healthcare provider medically determined that Ms. Torres had fibromyalgia prior to Dr. Aragon's February 24, 2010 diagnosis.[14]

### 5. Rheumatoid Arthritis

There is no evidence in the record that any healthcare provider medically determined that Ms. Torres had rheumatoid arthritis.

### 6. Chronic Fatigue Syndrome

On February 24, 2010, Ms. Torres presented to Dr. Aragon and complained of depression.  (Tr. 953.)  Dr. Aragon diagnosed Ms. Torres on that date with, *inter alia*, chronic fatigue.  (*Id.*)

### 7. Lupus

There is no evidence in the record that any healthcare provider medically determined that Ms. Torres had lupus.

### 8. Plantar Faciitis

Darlo G. Vander Wilt, DPM, treated Ms. Torres from August 6, 2001 until July 6, 2004, for bilateral plantar fasciitis, metatarsal phalangeal joint bursitis right, and hallux abducto valgus

---

approved Cymbalta for the treatment of depression (2004), generalized anxiety disorder (2007), diabetic peripheral neuropathic pain (2004), and major depressive disorder (2007).  *See* www.drugs.com/history/cymbalta.html.

[14] Petitioner relies on a dentist's coding record in support of his claim that Ms. Torres was diagnosed with fibromyalgia in 1999. Specifically, Dr. Clifford DDS's dental record of October 19, 1999, identified several diagnoses codes related to Ms. Torres' TMJ symptoms that included, *inter alia*, "729.10 Myalgia & Myositis Unspecified/Fibromyositis, Fibromyalgia."  (Tr. 224.)  However, Dr. Clifford's written report to Dr. Jaramillo, her referring doctor, clarified that his specific diagnosis as to that code was "729.10 Myospasm."  (Tr. 363.)  Thereafter, on February 7, 2000, Dr. Clifford apparently discussed with Ms. Torres "possible fibromyalgia" and gave her a brochure. (Tr. 358.)  On August 12, 2008, Dr. Clifford identified several diagnoses codes related to Ms. Torres' TMJ and sleep apnea symptoms that again included, *inter alia*, "729.1 Myalgia & Myositis Unspecified/Fibromyositis, Fibromyalgia."  (Tr. 335.)  On October 8, 2008, Dr. Clifford identified several diagnoses codes related to Ms. Torres' TMJ symptoms that again included, *inter alia*, "729.1 Myalgia & Myositis Unspecified/Fibromyositis, Fibromyalgia."  (Tr. 325.)

(bunion) right.  (Tr. 263-287.)  Dr. Vander Wilt's treatment during this time included orthotics, steroid injections, and surgeries.[15]  (*Id.*)

Dr. Vander Wilt next saw Ms. Torres on October 7, 2009, when she presented with right heel pain for two months.  (Tr. 995.)  Dr. Vander Wilt treated Ms. Torres with a steroid injection.  (*Id*.)

Dr. Vander Wilt treated Ms. Torres four times in 2012 for a symptomatic bunion on her left foot.  (Tr. 993-94, 996, 999.)

Dr. Vander Wilt saw Ms. Torres twice in 2014, on March 18, 2014, and April 8, 2014, when Ms. Torres presented with complaints of bilateral heel pain.  (Tr. 997-98.)

Sarah Mele, DPM, saw Ms. Torres on August 13, 2014, for a follow-up evaluation of her plantar fasciitis, bursitis, and gastrocnemius equinus.  (Tr. 1113-114.)  Dr. Mele advised Ms. Torres to continue wearing orthotics, icing, and taking Celebrex.  (*Id.*)  Dr. Mele also encouraged Ms. Torres to stretch on a more consistent basis.  (*Id.*)

### 9.   <u>Hepatitis C</u>

On April 30, 1993, Dr. Aragon noted that Ms. Torres had donated blood at United Blood Services after which they informed her she tested Hepatitis C positive.  (Tr. 200.)  Dr. Aragon referred Ms. Torres to Gastroenterologist James Martinez.  (Tr. 197-98, 200.)  Dr. Martinez assessed Ms. Torres with Hepatitis C positivity, but given her normal transaminases,[16] Dr. Martinez determined to follow her with liver function tests.  (Tr. 198.)  On September 20,

---

[15] Dr. Vander Wilt performed surgery on Ms. Torres' heels in 2002 (Tr. 278-282), and performed a bunionectomy and endoscopic plantar fasciotomy on Ms. Torres' right heel in October 2003 (Tr. 265-70).

[16] The presence of elevated transaminases may be an indicator of liver damage. https://en.wikipedia.org/wiki/Elevated_transaminases.

2010, Dr. Peisajovich noted that Ms. Torres' hepatitis C was inactive with a negative viral load. (Tr. 548.)

### 10.   Restless Leg Syndrome

On October 17, 2002, PAC Catherine Delaney of Los Lunas Family Practice noted that Ms. Torres had restless legs.  (Tr. 457.)

### 11.   Asthma[17]

From August 28, 2001 through January 9 2006, Dr. Aragon prescribed various medications[18] for bronchitis, reactive airway, ongoing cough, upper respiratory congestion, and shortness of breath.  (Tr. 426, 436, 447, 449, 471.)   On April 12, 2003, Dr. Aragon referred Ms. Torres for a pulmonary consult; however, there is no evidence in the record that Ms. Torres followed up with a pulmonologist at that time.   (Tr. 447.)   On July 17, 2007, Ms. Torres presented with complaints of fever, cough, headache and sore throat, and Dr. Aragon indicated for the first time a diagnosis, *inter alia*, of "Asthma Unspecified."  (Tr. 413.)  Dr. Aragon's notes indicated an asthma diagnosis four more times on October 22, 2007, June 3, 2009, February 24, 2010, and June 15, 2010.  (Tr. 412, 952-53, 959.)

### 12.   Depression and Anxiety

Dr. Aragon's notes referred for the first time to treatment for depression on February 19, 2000.  (Tr. 217.)  On that date, Ms. Torres reported to Dr. Aragon that the "Prozac worked until yesterday."[19]  (Tr. 217.)  From February 19, 2000, until February 24, 2003, Dr. Aragon's notes

---

[17]  Ms. Torres testified that she developed asthma in 2000 during the Cerro Grande fires in Los Alamos, New Mexico, and that she was hospitalized for a week in Española, New Mexico, for treatment.  (Tr. 602-03.) However, there is no medical evidence in the record demonstrating that Ms. Torres was hospitalized or treated for asthma in 2000.

[18]  QVAR and Combivent Inhalers, Albuterol by nebulizer, and Advair.  (Tr. 426, 436, 447, 449, 471.)

[19]  Dr. Clifford's notes dated March 8, 2000, indicate that Ms. Torres started taking Prozac around February 8, 2000. (Tr. 357.)

sporadically referred to Ms. Torres' reported depression and use of Prozac.  (Tr. 214-16, 453, 470, 474-77.)  On February 24, 2003, Ms. Torres reported to Dr. Aragon that she was either "hyper or depress[ed]."  (Tr. 453.)  Dr. Aragon planned to refer Ms. Torres to a psychiatrist.[20] (*Id*.)  Dr. Aragon prescribed Ativan for anxiety on that date.  (*Id.*)

On September 20, 2005, Dr. Aragon's notes indicated that Ms. Torres reported anxiety, however, Dr. Aragon did not prescribe any medication.  (Tr. 432.)  On January 9, 2006, Dr. Aragon prescribed Lorazepam for anxiety.  (Tr. 426.)  On January 17, 2006, Dr. Aragon prescribed Valium, 5mg.  (Tr. 414.)

On October 23, 2006, Dr. Aragon noted that Ms. Torres had stopped using Prozac approximately one year ago.  (Tr. 417.)  He also noted she reported "bad depression for years" and anxiety.  (*Id*.)  Dr. Aragon prescribed Lexapro and Cymbalta.  (*Id*.)  On November 7, 2006, Dr. Aragon noted that Ms. Torres reported feeling better on Cymbalta.  (Tr. 416.)

From June 3, 2009, until January 23, 2012, Dr. Aragon's notes sporadically referred to Ms. Torres' reported depression and/or anxiety and her use of Cymbalta and Valium.  (Tr. 928, 936, 950, 952, 953, 956, 959.)

Ms. Torres received counseling for depression and anxiety from Rio Grande Counseling and Guidance Services from March 9, 2010, until June 1, 2010.  (Tr. 497-523.)

### 13.  <u>Learning Disability</u>

On March 9, 2010, Ms. Torres reported to her counselor at Rio Grande Counseling and Guidance Services that she thought she had ADHD.  (Tr. 508.)  On August 27, 2014, Ms. Torres testified that after the Cerro Grande fires in Los Alamos, New Mexico, she acquired dyslexia.

---

[20] There is no evidence in the record that Ms. Torres was referred to or saw a psychiatrist at this time.

(Tr. 603.)  However, there is no evidence in the record that any healthcare provider medically determined that Ms. Torres had ADHD or dyslexia.

### 14.   <u>Torn Meniscus – Right Knee</u>[21]

On October 27, 2009, Dr. Samuel Tabet referred Ms. Torres to Robert Wilson, M.D., of New Mexico Orthopaedics for evaluation of bilateral knee pain caused by osteoarthritis. (Tr. 544-45.)  Dr. Wilson noted that the left knee "may be a little worse by x-ray or MRI," and that the "MRI did not show significant tear of the meniscus [of the right knee] but revealed some cartilage damage." (*Id.*)  Dr. Wilson determined that Ms. Torres was not a candidate for surgery and proceeded with hyaluronic acid injections in both knees on that date. (*Id.*)  Dr. Wilson administered hyaluronic acid or Euflexxa injections on November 4, November 13, November 20, and November 24, 2009; May 28, June 4, and June 11, 2010; May 12, May 20 and May 25, 2011; and August 9, August 21, and August 28, 2012. (Tr. 537-43, 1007-08, 1017-18, 1020, 1053, 1057, 1063.)

On December 4, 2012, Ms. Torres returned to Dr. Tabet for follow up regarding her complaint of bilateral osteoarthritis in her knees. (Tr. 1044-45.)  Dr. Tabet administered steroid injections and informed Ms. Torres that she may require arthroscopy of the right knee in the future. (*Id.*)  On December 28, 2012, an MRI of the right knee demonstrated, *inter alia*, a complete radial tear of the medial meniscus. (Tr. 1085.)  On February 13, 2013, Dr. Tabet performed a right knee scope, medial meniscectomy. (Tr. 1033.)  On September 17, 2013, Dr. Tabet administered a steroid injection for Ms. Torres' complaints of swelling and aching in

---

[21] Ms. Torres testified that she fell when she was working in Los Alamos, New Mexico, and injured her knees. (Tr. 606.)  On March 23, 2011, Dr. Aragon noted that Ms. Torres reported she fell in 2000 in Los Alamos and suffered a right torn meniscus. (Tr. 936.)  However, there is no medical evidence in the record demonstrating that Ms. Torres was treated for a right torn meniscus in 2000.

her right knee.  (Tr. 1102-03.)  On October 15, 2013, Dr. Tabet administered a steroid injection for Ms. Torres' complaint of right knee pain.  (Tr. 1049.)

On December 3, 2013, Ms. Torres presented to Dr. Scott Stoerner of Albuquerque Center for Rheumatology for an urgent evaluation of persistent swelling over her right knee.  (Tr. 1073.) Dr. Stoerner indicated that the synovial biopsy was consistent with gout.  (Tr. 1076.)  On December 11, 2013, Ms. Torres returned to Dr. Stoerner with complaints of right knee effusion and pain.  (Tr. 985.)  Dr. Stoerner aspirated Ms. Torres' right knee and injected it with methylprednisolone without complications.  (Tr. 989-90.)  On April 24, 2014, Dr. Stoerner noted that Ms. Torres' right knee pain was related to degenerative arthritis and not inflammatory arthritis.  (Tr. 975.)

On June 5, 2014, Ms. Torres returned to Dr. Tabet with complaints of right knee pain and swelling.  (Tr. 1104-05.)  Dr. Tabet administered a steroid injection and discussed a total knee replacement.  (*Id.*)

### 15.   Left Shoulder Bursitis

On August 21, 2012, Ms. Torres presented to Krishna Tripuraneni, M.D., of New Mexico Orthopaedics, for evaluation of shoulder pain, left shoulder more than right.  (Tr. 1058.) Dr. Tripuraneni ordered an MRI of the left shoulder and instructed Ms. Torres to follow up after receiving the MRI.  (Tr. 1061.)  There is no evidence in the medical record of any additional follow up for Ms. Torres' left shoulder pain.

### 16.   MRSA

Ms. Torres reported to Dr. Aragon on November 13, 2008, that her father had contracted MRSA.  (Tr. 408.)  Ms. Torres was then tested for MRSA and the lab results indicated no evidence of MRSA.  (Tr. 407.)

### 17. **Mitral Valve Disorder**

There is no evidence in the record that any healthcare provider medically determined that Ms. Torres had a mitral valve disorder.

### 18. **Bladder Spasms**

On August 11, 2006, Ms. Torres presented to Jonathan Lackner, M.D., with complaints of stress urinary incontinence. (Tr. 302.) On January 10, 2007, Dr. Lackner performed a vaginal sling to help control Ms. Torres' stress incontinence. (Tr. 309-13.)

### 19. **Acid Reflux**

On January 6, 2016, Ms. Torres underwent an esophagogastroduodenoscopy which presented evidence of erosive gastritis. (Tr. 1181.)

### 20. **Ulcer**

There is no evidence in the record that any healthcare provider medically determined that Ms. Torres had an ulcer.

### 21. **Varicose Veins**

On October 16, 2002, Dr. Aragon's notes indicated that Ms. Torres had "vein stripping last week." (Tr. 458.)

### 22. **Glaucoma, Cataracts, Iritis**

On September 15, 2010, Dr. Walters referred Mr. Torres to ophthalmologist Dr. Chiu to assess any ocular involvement related to her morphea diagnosis. (Tr. 558.) However, the medical record evidence does not contain any records from Dr. Chiu or any other ophthalmologist who medically determined that Ms. Torres had glaucoma, cataracts, or iritis.

B.   **Physical Residual Functional Capacity Questionnaires, Medical Assessments, and To Whom It May Concern Letters**

   1.   **Darlo G. Vander Wilt, DPM**

On November 12, 2009, Dr. Darlo G. Vander Wilt completed a Physical Residual Functional Capacity Questionnaire on Ms. Torres' behalf.  (Tr. 490-94.)  Dr. Vander Wilt represented that Ms. Torres' diagnoses included plantar fasciitis of the right foot.  (Tr. 490.) Dr. Vander Wilt indicated that Ms. Torres' pain and other symptoms would frequently interfere with her attention and concentration, but that she was capable of moderate stress jobs.  (Tr. 491.) Dr. Vander Wilt assessed that Ms. Torres could sit for more than two hours and stand for twenty minutes.  (*Id*.)  Dr. Vander Wilt assessed that Ms. Torres could sit for a total of four hours in an eight-hour workday, and could stand/walk for less than two hours.  (Tr. 492.)  Dr. Vander Wilt indicated that Ms. Torres required a job that permitted shifting positions at will from sitting, standing or walking.  (*Id.*)  Dr. Vander Wilt assessed that Ms. Torres could occasionally lift ten pounds and rarely lift twenty pounds.  (*Id*.)  Dr. Vander Wilt indicated that his description of symptoms and limitations applied from 2005 forward.  (Tr. 493.)

   2.   **Dr. Joseph Aragon**

   a.   **April 7, 2010**

On April 7, 2010, Dr. Aragon completed a Physical Residual Functional Capacity Questionnaire on Ms. Torres' behalf.  (Tr. 485-489.)  He represented that Ms. Torres' diagnoses included depression, fibromyalgia, degenerative arthritis, Hepatitis C, and torn meniscus. (Tr. 485).  Dr. Aragon indicated that Ms. Torres' pain and other symptoms would constantly interfere with her attention and concentration, and that she was incapable of even low stress jobs

due to her "bipolar depression"[22] and inability to cope with stress.  (Tr. 486.)  Dr. Aragon assessed that Ms. Torres could sit for ten minutes, stand for ten minutes, could sit and/or stand/walk for less than two hours in an eight-hour workday, that Ms. Torres had to walk every ten minutes for ten minutes, and that Ms. Torres required a job that permitting shifting positions at will from sitting, standing or walking.  (Tr. 487.)  Dr. Aragon assessed that Ms. Torres could rarely lift ten pounds or less.  (*Id.*)  Dr. Aragon indicated that his description of symptoms and limitations applied from July 1999 forward.  (Tr. 488.)

### b.    April 17, 2014

On April 17, 2014, Dr. Aragon completed a Medical Assessment of Ability to do Work-Related Activities (Physical) in which he represented he considered Ms. Torres' medical history and the chronicity of findings as from December 31, 2005, to current examination.  (Tr. 806.) Dr. Aragon assessed that Ms. Torres could not maintain physical effort for long periods due to pain and fatigue.  (*Id.*)  He also assessed that Ms. Torres could occasionally lift and/or carry less than ten pounds, could frequently lift and/or carry less than five pounds, could stand and/or walk less than two hours in an eight-hour workday, and must periodically alternate between sitting and standing to relieve her pain.  (*Id.*)  Dr. Aragon further assessed that Ms. Torres was limited in her ability to push and/or pull, to handle and/or finger, should only occasionally stoop and crouch, and should never kneel or crawl.  (*Id.*)

On April 17, 2014, Dr. Aragon also completed a Medical Assessment of Ability to do Work-Related Activities (Non-Physical) in which he represented he considered Ms. Torres' medical history and the chronicity of findings as from December 31, 2005, to current

---

[22] It is unclear whether Dr. Aragon is utilizing the term "bipolar depression" to refer to the low, or depressive phase, of bipolar disorder.  In February 2003, Ms. Torres told the physician assistant in Dr. Aragon's office that she was either hyper or depressed, and the PAC referred her to a psychiatrist to rule out bipolar disorder.  (Tr. 453). However, there is no indication in the record that Ms. Torres followed through with that referral or was otherwise ever medically diagnosed with bipolar disorder.

examination.  (Tr. 807.)  Dr. Aragon assessed that Ms. Torres had *moderate* limitations in her ability to (i) maintain attention and concentration and (ii) to make simple work-related decision; and *marked* limitations in her ability to (i) perform activities within a schedule, (ii) maintain regular attendance, (iii) maintain physical effort, (iv) sustain an ordinary routine, (v) work in coordination or proximity to others, and (vi) complete a normal workday/workweek without interruptions from pain and/or fatigue.  (*Id.*)

On April 17, 2014, Dr. Aragon completed a Medical Assessment of Ability to do Work-Related Activities (Mental) in which he represented he considered Ms. Torres' medical history and the chronicity of findings as from December 31, 2005, to current examination.  (Tr. 808-09.) Dr. Aragon assessed that Ms. Torres had the following limitations:

Understanding and Memory.  *Slight* limitations in her ability to (i) remember locations and work-like procedures and (ii) understand remember very short and simple instructions; and *moderate* limitations in her ability to understand and remember details instructions.

Sustained Concentration and Persistence.  *Slight* limitations in her ability to (i) carry out very short and simple instructions and (ii) make simple-work-related decisions; *moderate* limitations in her ability to (i) carry out detailed instructions, (ii) maintain attention and concentration for extended periods of time, and (iii) work in coordination with others; and *marked* limitations in her ability to (i) perform activities within a schedule, (ii) sustain an ordinary routine, and (iii) complete a normal workday and/or workweek without interruptions for psychological based symptoms.

4.    Social Interaction.  *Slight* limitations in her ability to ask simple questions; and *moderate* limitations in her ability to interact appropriately with the general public, (ii) accept

instructions and respond appropriately to supervisors, (iii) get along with coworkers or peers, and (iv) maintain socially appropriate behavior.

5.    <u>Adaptation</u>.   *Marked* limitations in her ability to (i) respond appropriately to changes in the workplace, (ii) be aware of normal hazards, (iii) travel to unfamiliar places or use public transportation, and (iv) set realistic goals or make plans independently of others.  (Tr. 807-09.)

Dr. Aragon further assessed that Ms. Torres mental impairments met the listing requirements for 12.04 Affective Disorders and 12.06 Anxiety-Related Disorders[23] demonstrating she was presumptively disabled.  (Tr. 811-12.)

### c.    <u>August 11, 2014</u>

On August 11, 2014, Dr. Aragon prepared a "To Whom It May Concern" letter stating that Ms. Torres had been his patient for over 30 years, and that he had been treating her for both physical and psychological impairments during that time.   (Tr. 1109-10.)   Specifically, Dr. Aragon stated he had been prescribing antidepressants since May 2000, that he still concurred in his previous assessment of Ms. Torres' limitations, and that he concurred in Dr. Esther Davis' findings.[24]  (*Id.*)

### 3.    <u>Sarah Mele, DPM</u>

### a.    <u>August 13, 2013 [sic]</u>

On August 13, 2013 [sic], Sara Mele, DPM, completed a Medical Assessment of Ability to do Work-Related Activities (Physical) in which she represented she considered Ms. Torres' medical history and the chronicity of findings as from 2005 to current examination.  (Tr. 1116.)

---

[23] 20 C.F.R. pt. 404, subpt. P. app. 1.

[24] On April 10, 2014, Dr. Esther D. Davis psychologically evaluated Ms. Torres for her disability claim.  (Tr. 815-24.)

Dr. Mele assessed that Ms. Torres could not maintain physical effort for long periods due to pain and fatigue.  (*Id*.)  She also assessed that Ms. Torres could occasionally lift and/or carry less than five pounds, could frequently lift and/or carry less than five pounds, could stand and/or walk less than two hours in an eight-hour workday, and must periodically alternate between sitting and standing to relieve her pain.  (*Id*.)  Dr. Mele further assessed that Ms. Torres was limited in her ability to push and/or pull, to handle and/or finger, and should never kneel, stoop, crouch, or crawl.  (*Id*.)

### b.       August 13, 2014

On August 13, 2014, Dr. Mele also completed a Medical Assessment of Ability to do Work-Related Activities (Non-Physical) in which she represented she considered Ms. Torres' medical history and the chronicity of findings as from 2005 to current examination.  (Tr. 1117.) Dr. Mele assessed that Ms. Torres had *slight* limitations in her ability to make simple work-related decisions, but had *marked* limitations in her ability to (1) maintain attention and concentration; (2) perform activities within a schedule; (3) maintain regular attendance and be punctual; (4) maintain physical effort for long period; (5) sustain an ordinary routine; (6) work in coordination with/or proximity to others; and (7) complete a normal workday and workweek without interruptions.  (*Id*.)

### c.       August 25, 2014

On August 25, 2014, Dr. Mele prepared a "To Whom It May Concern" letter stating that based on her exam on August 13, 2014, of Ms. Torres, and her review of prior records, she believed that the limitations she assessed "could have reasonably been present prior to 12/31/2005."  (Tr. 1205.)

4.    **Esther D. Davis, Ph.D.**

On April 10, 2014, Dr. Esther D. Davis psychologically evaluated Ms. Torres for her disability claim.  (Tr. 815-24.)  Ms. Torres represented to Dr. Davis that she had been diagnosed with morphea, rheumatoid arthritis, bursitis, plantar fasciitis, fibromyalgia, chronic fatigue syndrome, anemia, ophthalmological problems, sleep apnea, asthma, restless leg syndrome, mitral valve prolapse, Hepatitis B, Hepatitis C, and lupus.  (Tr. 816-17.)  Ms. Torres also reported she suffered from acid reflux, ulcers, chronic headaches, glaucoma, obesity, depression and anxiety.  (*Id.*)  Based on Ms. Torres' reported medical and psychiatric histories, and the results of various psychological assessments,[25] Dr. Davis diagnosed Ms. Torres as follows:

| | | |
|---|---|---|
| Axis I: | 300.4 | Dysthymia |
| | 296.33 | Major Depressive Disorder, Recurrent, Severe Without Psychotic Features |
| | 300.02 | Generalized Anxiety Disorder |
| | 300.21 | Panic Disorder, with Agoraphobia |
| Axis II: | 799.9 | Diagnosis Deferred |
| Axis III: | | Morphea, fibromyalgia, rheumatoid arthritis, chronic fatigue syndrome, glaucoma, lupus, hepatitis B and C, TMJ, asthma, restless leg syndrome, plantar fasciitis, sleep apnea, chronic headaches, obesity, mitral valve prolapse, bursitis, oophorectomies, acid reflux, ulcers, dyslexia |
| Axis IV: | | Family stressors, concerns about her husband's health, economic |
| Axis V: | | Current GAF = 42    Past Year GAF = 42 |

(Tr. 822-23.)

Dr. Davis also completed a Medical Assessment of Ability to do Work-Related Activities (Mental) in which she represented she considered Ms. Torres' medical history and the chronicity

---

[25] Dr. Davis administered the Burns Depression Inventory, the Generalized Anxiety Disorder 7, and the Montreal Cognitive Assessment.  (Tr. 822.)

of findings as from December 31, 2005, to current examination.  (Tr. 825.)  Dr. Davis assessed that Ms. Torres had the following limitations:

Understanding and Memory.  *Slight* limitations in her ability to understand remember very short and simple instructions; and *moderate* limitations in her ability to (i) remember location and work-like procedures and (ii) understand and remember details instructions.

Sustained Concentration and Persistence.  *Slight* limitations in her ability to make simple work-related decisions; *moderate* limitations in her ability to carry out very short and simple instructions; and *marked* limitations in her ability to (i) carry out detailed instructions, (ii) maintain attention and concentration for extended periods of time, (iii) perform activities within a schedule, (iv) sustain an ordinary routine, (v) work in coordination or proximity to others, and (vi) complete a normal workday and/or workweek without interruptions for psychological based symptoms.

Social Interaction.  *Slight* limitations in her ability to (i) interact appropriately with the general public, (ii) ask simple questions, (iii) get along with coworkers or peers, and (iv) maintain socially appropriate behavior; and *moderate* limitations in her ability to accept instructions and respond appropriately to supervisors.

Adaptation.  *Slight* limitations in her ability to (i) respond appropriately to changes in the workplace and (ii) be aware of normal hazards; and *marked* limitations in her ability to (i) travel to unfamiliar places or use public transportation and (ii) set realistic goals or make plans independently of others.  (Tr. 825-26.)

Dr. Davis further assessed that Ms. Torres' depression met the listing requirements for 12.04 Affective Disorders[26] demonstrating she was presumptively disabled.  (Tr. 828.)

---

[26] 20 C.F.R. pt. 404, subpt. P. app. 1.

### 5.     Daniel W. Clifford, D.D.S.

On August 12, 2014, Dr. Clifford prepared a Medical Assessment of Sleep-Disordered Breathing and represented that he considered Ms. Torres' medical history and the chronicity of findings as from prior to 2005 to present.  (Tr. 1119.)  Dr. Clifford assessed that Ms. Torres suffered from sleep-disordered breathing, obstructive sleep apnea-hypopnea, and fatigue due to sleep apnea syndrome.  (*Id.*)  Dr. Clifford noted that "[t]he above answers [were] based on the sleep study done at Presbyterian Sleep Disorders Center, signed by Dr. Richard Seligman dated 5/7/2008." (*Id.*)  Dr. Clifford did not assess any functional limitations based on fatigue.  (*Id.*)

On August 12, 2014, Dr. Clifford also prepared a Medical Assessment of Temporomandibular Joint Disorder (TMJ) and represented he considered Ms. Torres' medical history and the chronicity of findings as from prior to 2005 to present.  (Tr. 1120.)  Dr. Clifford assessed that Ms. Torres suffered from TMJ and experienced pain in her face, jaw joint, neck and shoulder.  (*Id.*)  He also assessed she had pain associated with chewing, speaking, and opening her mouth wide.  (*Id.*)  Dr. Clifford noted that "[t]he answers above [were] based on information that is more than 2-3 years old.   Her last appointment for TMJ splint adjustment was November 23, 2009." (*Id.*)  Dr. Clifford did not assess any functional limitations based on TMJ. (*Id.*)

### C.     Analysis

#### 1.     The ALJ Properly Assessed Joseph Aragon, M.D.'s Opinion[27]

---

[27] Ms. Torres' Motion primarily addressed the ALJ's failure to properly assess treating physician Dr. Aragon's opinion, although stated it was worth noting that the ALJ gave little weight to the opinions of Drs. Vander Wilt and Mele.  (Doc. 22 at 14-21.)   The Commissioner addressed the ALJ's analysis of Dr. Vander Wilt's and Dr. Mele's opinions as treating physicians in her Response.  (Doc. 34 at 18-20.)  Thus, Ms. Torres argued more specifically in her Reply that the ALJ also failed to properly assess Dr. Vander Wilt's and Dr. Mele's opinions as treating physicians.  (Doc. 35 at 3-9.)  The Court addresses the ALJ's analysis of Dr. Vander Wilt's and Dr. Mele's opinions in Section IV.C.2., *infra*.

Ms. Torres first argues that ALJ Farris failed to accord the proper weight to treating physician Joseph Aragon, M.D., as required by SSR 96-2p.[28]  (Doc. 22 at 14-21.)  Specifically, Ms. Torres argues that ALJ Farris concluded that Dr. Aragon's opinion was not entitled to controlling weight, but then "failed at the second prong of the analysis to describe why his longitudinal insight was 'not well supported by medically acceptable and laboratory diagnostic techniques . . . .'"  (*Id.* at 21.)  Ms. Torres further asserts that the ALJ rejected Dr. Aragon's opinion for erroneous reasons.  (*Id.*)  The Commissioner contends that the ALJ did not err in her evaluation of Dr. Aragon's opinions because she properly noted his various opinions were rendered at least four to eight years after Ms. Torres' date of last insured, and there were no objective findings in Dr. Aragon's treatment notes prior to Ms. Torres' date of last insured that supported the extreme limitations in his opinions.  (Doc. 34 at 17.)  The Court agrees.

An ALJ is required to conduct a two-part inquiry with regard to treating physicians. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  First, the ALJ *must* decide whether a treating doctor's opinion commands controlling weight.  638 F.3d at 1330.  A treating doctor's opinion must be accorded controlling weight "if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (applying SSR 96-2p, 1996 WL 374188, at *2).[29]  If a treating doctor's opinion does not meet this standard, the opinion is still entitled to deference to some extent as determined under the second step of the process. *Id.*  In this second step, the ALJ *must* determine the weight to accord

---

[28] SSR 96-2p addresses policies regarding evaluating treating source medical opinions.  SSR 96-2p, 1996 WL 374188.

[29] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes.  *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35*; see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

the treating physician by analyzing the treating doctor's opinion against the several factors provided in 20 C.F.R. § 404.1527(c).[30]   The ALJ is not required to "apply expressly" every relevant factor.  *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).  "Under the regulations, the agency rulings, and our case law, an ALJ must give good reasons . . . for the weight assigned to a treating physician's opinion," that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight."  *Langley*, 373 F.3d at 1119 (quoting *Watkins*, 350 F.3d at 1300).  Finally, if the ALJ rejects the opinion completely, she *must* then give "'specific, legitimate reasons'" for doing so.  *Watkins*, 350 F.3d at 1301 (citing *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996) (quoting *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987)).

Here, the ALJ properly conducted both parts of the two-part inquiry *Krauser* requires. 638 F.3d at 1330.  As to the first part, the ALJ found that Dr. Aragon's opinion, as set out in medical source statement forms dated April 7, 2010, and April 17, 2014, and a letter dated

---

[30] These factors include:

> (1)  Examining relationship. . . . (2) Treatment relationship. . . . (i) Length of the treatment relationship and the frequency of examination. . . . (ii) Nature and extent of the treatment relationship. . . . (3) Supportability.  The more a medical source presents evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the ALJ] will give that opinion.  The better an explanation a source provides for an opinion, the more weight [the ALJ] will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with [the claimant], the weight [the ALJ] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  [The ALJ] will evaluate the degree to which these opinions consider all of the pertinent evidence in [a claimant's] claim, including opinions of treating and other examining sources.  (4)  Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion.  (5)  Specialization.  [The ALJ will] generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.  (6)  Other factors.  When [the ALJ] consider[s] how much weight to give to a medical opinion, [the ALJ] will also consider any factors [brought] to [her] attention or of which [she is] aware, which tend to support or contradict the opinion.  For example, the amount of understanding of [SSA's] disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in [a claimant's] case record are relevant factors that [the ALJ] will consider in deciding the weight to give a medical opinion.

20 C.F.R. § 404.1527(c).

August 11, 2014, was not entitled to controlling weight because it was not well supported by medically acceptable clinical and laboratory diagnostic techniques and was not consistent with other substantial evidence in the record.  (Tr. 584.)   "The agency ruling contemplates that the ALJ will make a finding as to whether a treating source opinion is entitled to controlling weight." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).  A treating doctor's opinion must be accorded controlling weight "if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (applying SSR 96-2p, 1996 WL 374188, at *2).   Here, the ALJ properly determined and explained why Dr. Aragon's opinion was not entitled to controlling weight.

As to the second part, the ALJ was sufficiently specific regarding the weight she accorded Dr. Aragon's opinion and the reason for that weight.  After a lengthy and detailed explanation regarding the reasons for according Dr. Aragon's opinion little weight, the ALJ summarized that "Dr. Aragon may be describing the claimant's recent and current impairments and functioning in his medical source statements and letters, but he is not describing her condition prior to December 31, 2005."   Ms. Torres disagrees and argues that the ALJ's evaluation of Dr. Aragon's diagnoses and opinions was "rife with inaccuracies" because (1) Dr. Aragon's April 17, 2014, medical source statement considered Ms. Torres' medical history from "December 31, 2005, to current examination"; (2) Dr. Aragon represented he had prescribed antidepressants to Ms. Torres "ever since [March 30, 2000]; and (3) Dr. Aragon and Dr. Clifford had each diagnosed Ms. Torres with fibromyalgia in 1999 and 2000.   (Doc. 22 at 18-19.)  The Court is not persuaded.

As an initial matter, Ms. Torres' argument is misplaced because the ALJ considered and answered the relevant question of whether the record itself provided evidence of actual disability prior to Ms. Torres' date of last insured.  "[A] treating physician may provide a retrospective diagnosis of a claimant's condition.  However, the relevant analysis is whether the claimant was actually disabled prior to the expiration of [his] insured status."  *Potter v. Sec'y of Health and Human Servs.*, 905 F.2d 1346, 1348-49 (10th Cir. 1990) (internal citations omitted).  Moreover, as discussed below, the ALJ's explanation for according little weight to Dr. Aragon's opinion is supported by substantial evidence.

Here, the ALJ noted that Dr. Aragon retrospectively assessed that Ms. Torres' impairments of depression, fibromyalgia, degenerative arthritis, Hepatitis C, and torn meniscus rendered her disabled prior to her date of last insured on December 31, 2005.  (Tr. 485-86.)  The ALJ explained, however, that the medical record evidence either did not support the presence of or the severity of the impairments upon which Dr. Aragon relied to make his assessment.  First, Ms. Torres argues that Dr. Aragon represented he prescribed antidepressants to Ms. Torres for her depression since March 30, 2000, and there was no reason to doubt the veracity of his representation.  (Doc. 22 at 19.)  However, as the ALJ found, Dr. Aragon's treatment notes for the two years prior to Ms. Torres' date of last insured did not even mention depression and/or bipolar depression.  (Tr. 585.)  The record supports this finding.[31]  The ALJ also noted that Dr. Aragon was not a psychiatrist and there was no bipolar disorder diagnosis in the record from a mental health specialist.  (*Id.*)  The regulations provide that an ALJ should consider a provider's specialization when evaluating opinion evidence.  *See* 20 C.F.R. 404.1527(c)(5) (explaining that more weight is generally given to the opinion of a specialist).  Finally, the ALJ

---

[31]  The Court's review of the record further supports that Dr. Aragon's notes from February 19, 2000, until February 4, 2003, reflect only sporadic references to depression and/or Dr. Aragon prescribing antidepressants. (Tr. 214-17, 453, 470, 474-77.)

noted that Ms. Torres did not allege "depression, anxiety, or any other mental disorder," when she initially filed her disability application. (Tr. 585.) The record supports that Ms. Torres did not allege depression in her initial disability application, but reported her depression worsened around October 2009, well after Ms. Torres' date of last insured. (Tr. 169.) For these reasons, the ALJ was free to disregard Dr. Aragon's representation regarding his treatment of Ms. Torres' depression because it was not supported by specific evidence in the record. *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003.)

Second, the ALJ explained that Ms. Torres was not diagnosed with fibromyalgia until several years after her date of last insured. (*Id*.) The record supports this finding. On October 19, 1999, dentist, Daniel Clifford, DDS saw Ms. Torres on referral from Dr. Jaramillo to assess Ms. Torres' post-motor vehicle accident jaw pain. (Tr. 362-63.) On that date, Dr. Clifford identified several diagnoses codes that included, *inter alia*, "729.10 Myalgia & Myositis Unspecified/Fibromyositis, Fibromyalgia."[32] (Tr. 224.) However, Dr. Clifford's written report to Dr. Jaramillo narrowed the scope of this diagnosis code to "myospasm." (Tr. 363.) Moreover, during the course of treating Ms. Torres for her TMJ symptoms at that time, Dr. Clifford discussed with Ms. Torres only the *possibility* of fibromyalgia and provided her an informational brochure. (Tr. 358.) Significantly, there is no evidence in the record that Ms. Torres followed up with any qualified healthcare provider to medically determine she had fibromyalgia at that time. It was not until February 24, 2010, that Dr. Aragon first noted a fibromyalgia diagnosis. For these reasons, Ms. Torres argument that both Dr. Aragon and Dr. Clifford diagnosed her with fibromyalgia in 1999 and 2000 necessarily fails. (Doc. 22 at 19.)

---

[32] Ms. Torres attributes this diagnosis to Dr. Aragon, but the record is dated October 19, 1999, the date on which Dr. Clifford evaluated Ms. Torres, and corresponds to Dr. Clifford's report to Dr. Aragon. (Tr. 224, 362-63.)

Third, the ALJ explained that Dr. Aragon's opinion that Ms. Torres had disabling degenerative arthritis in her knees, neck and shoulder prior to her date of last insured was not supported by the record.  (Tr. 585.)  The ALJ noted that MRI studies of Ms. Torres' cervical, thoracic and lumbar spine done on October 21, 1999, and May 30, 2000, following her first motor vehicle accident, were unremarkable.  (Tr. 219, 370, 372.)  The ALJ noted that nerve studies conducted on May 23, 2000, by neurologist Michael Freedman, M.D., to evaluate Ms. Torres' complaints of left-sided weakness were negative.  (Tr. 373.)  The ALJ further noted that Ms. Torres' lumbosacral and TMJ complaints had resolved by the end of 2000.  (Tr. 357, 370.)  The ALJ explained that on August 22, 2003, Ms. Torres complained to Dr. Aragon of back, neck, and left knee pain following her involvement in a second motor vehicle accident, but that there was no further mention of these complaints after that date.  (Tr. 585.)  Finally, the ALJ noted that it was not until 2009 that Ms. Torres sought treatment for bilateral knee pain and was diagnosed at that time with osteoarthritis.  (Tr. 544-45.)  The record supports these findings.

Fourth, the ALJ explained that Ms. Torres' Hepatitis C diagnosis had been present but asymptomatic for many years.  (Tr. 585.)  The record supports this finding.  On April 30, 1993, Ms. Torres tested Hepatitis C positive; however, upon further evaluation it was determined she had completely normal liver function.  (Tr. 198, 200.)  Further, the Court's review of the record did not reveal any evidence of symptoms and/or treatment related to Ms. Torres' Hepatitis C.  Finally, on September 20, 2010, Dr. Peisajovich noted that Ms. Torres' hepatitis C was inactive with a negative viral load.  (Tr. 548.)

Lastly, the ALJ found that Dr. Aragon's assessment that Ms. Torres' torn meniscus in her right knee was disabling prior to Ms. Torres' date of last insured was not supported.  The ALJ explained that Ms. Torres did not seek treatment for her bilateral knee pain until 2009, well after

Ms. Torres' date of last insured.  (Tr. 585.)  The record supports this finding.  Dr. Wilson and

Dr. Tabet treated Ms. Torres for bilateral knee pain from October 27, 2009, through June 5,

2014.  *See* Section IV.A.14, *supra*.

For these reasons, the Court finds that the ALJ properly found that Dr. Aragon's opinion,

as set out in medical source statement forms dated April 7, 2010, and April 17, 2014, and a letter

dated August 11, 2014, was not entitled to controlling weight because it was not well supported

by medically acceptable clinical and laboratory diagnostic techniques and was not consistent

with other substantial evidence in the record.  (Tr. 584.)  The Court further finds that the ALJ

was sufficiently specific regarding the weight she accorded Dr. Aragon's opinion and the reasons

for that weight.  In short, the ALJ applied the correct legal standard in evaluating Dr. Aragon's

opinion and her findings were supported by substantial evidence.

### 2. The ALJ Properly Evaluated Dr. Vander Wilt's and Dr. Mele's Opinions

The ALJ also properly evaluated Dr. Vander Wilt's and Dr. Mele's opinions and

explained why she accorded them little weight.  (Tr. 584.)  Dr. Vander Wilt completed a medical

source statement on November 12, 2009, four years after Ms. Torres' date of last insured, and

indicated that Ms. Torres required a job that permitted shifting positions at will from sitting,

standing or walking.  (Tr. 492.)  Dr. Vander Wilt indicated that this limitation applied from 2005

forward.  (Tr. 493.)  The ALJ explained, however, that Ms. Torres saw Dr. Vander Wilt for

specialized care for bilateral foot pain beginning in 2001 and through July 2004, but did not see

Dr. Vander Wilt next until five years later in October 2009, when she reported right foot pain

that "*had existed for two months*."  (Tr. 583-84.) (Emphasis in original.)  The ALJ also explained

that Dr. Vander Wilt never noted that Ms. Torres expressed any complaints of pain or discomfort

with sitting when he treated her plantar fasciitis between 2001 and 2004, nor did he explain how

plantar fasciitis would affect Ms. Torres' ability to sit.  (Tr. 584.)  *See Potter*, 905 F.2d at 1348-49 ("[A] treating physician may provide a retrospective diagnosis of a claimant's condition. However, the relevant analysis is whether the claimant was actually disabled prior to the expiration of [his] insured status.").   The ALJ further explained that around the time Dr. Vander Wilt completed his medical source statement, Ms. Torres reported daily exercise that included cardio workouts, elliptical training, bicycling, and walking[33] -- activities that were inconsistent with Dr. Vander Wilt's assessed limitations.  (*Id.*)

As for Dr. Mele, the ALJ explained that Dr. Mele saw Ms. Torres only once, on August 13, 2014, for a follow-up evaluation of foot pain.  (Tr. 584, 1113-14.)  Dr. Mele completed disability paperwork on Ms. Torres' behalf on that date and assessed that Ms. Torres needed to periodically alternate between sitting and standing.  (Tr. 1116.)  On August 25, 2014, Dr. Mele prepared a "To Whom It May Concern" letter stating that the limitations she assessed "could have reasonably been present prior to 12/31/2005."  (Tr. 1205.)  For all of the same reasons she gave little weight to Dr. Vander Wilt's opinion, combined with the fact that Dr. Mele only saw Ms. Torres once for the first time in 2014, the ALJ also gave little weight to Dr. Mele's retrospective opinion.  (*Id.*)  The ALJ was sufficiently specific in providing good reasons for the weight she assigned to both Dr. Vander Wilt's and Dr. Mele's opinions and properly found that those opinions and limitations were not supported by the record.  (Tr. 584.)  *See Langley*, 373 F.3d at 1119 (an ALJ must give good reasons for the weight assigned to a treating physician's opinion that are sufficiently specific).

---

[33] The record supports that Ms. Torres reported to CFNP Pangan on May 5, 2008, that she exercised daily for two hours between cardio and weights (Tr.  379-80); she reported to Dr. Clifford on August 10, 2008, that she worked out daily Monday through Friday for one to one and one half hours alternating between cardio and spin classes (Tr. 343); and she reported to Dr. Wilson on October 27, 2009, that while the osteoarthritis in her knees caused pain with, *inter alia*, sitting, she tolerated and did elliptical training, bicycling, and walking (Tr. 544); and she reported to her counselor at Rio Grande Counseling and Guidance Service on March 9, 2010, that she enjoyed working out at the gym and outdoor work for her recreation (Tr. 515).

### 3.    The ALJ Did Not Err in Her Hypothetical to the Vocational Expert

Ms. Torres next argues that ALJ Farris failed to pose a hypothetical to the VE that contained all of Ms. Torres' restrictions as required by SSR 96-8p and then relied on the VE's testimony to support her RFC finding.[34]   (Doc. 22 at 21-25.)   Specifically, Ms. Torres argues that the functional assessments of Dr. Aragon, Dr. Vander Wilt, and Dr. Mele required the ALJ to include a sit-stand option in her hypothetical to the VE.   (*Id*.)   The Commissioner contends that the ALJ reasonably assigned little weight to the opinions of Dr. Aragon, Dr. Vander Wilt, and Dr. Mele, and that the ALJ was not required to include limitations in her hypothetical questions to the VE that were incredible or unsupported by the record.   (Doc. 34 at 15.)   The Court agrees.

The ALJ did not err in excluding a sit/stand option in her hypothetical to the VE.   In the Tenth Circuit, hypothetical questions to a vocational expert need only include those limitations that the ALJ finds are established by substantial evidence.   *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995).   "Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision."   *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991.)   Here, as previously discussed, the ALJ sufficiently explained why she accorded little weight to the opinions of Dr. Aragon, Dr. Vander Wilt, and Dr. Mele.   *See* Sections IV.C.1. and 2., *supra.*   Because the ALJ properly found that Ms. Torres' asserted need to alternate between sitting and standing prior to her date of last insured was not supported by substantial evidence, it was not error for the ALJ to have excluded this limitation from her hypothetical to the VE.   *Evans*, 55 F.3d at 532.

---

[34] SSR 96-8p addresses policies regarding a claimant's RFC assessment and does not address hypotheticals to vocational experts.   SSR 96-8p, 1996 WL 374184.   "Social Security has no regulation regarding hypotheticals."   3 Soc. Sec. Disb. Claims Prac. & Proc. § 27:75 (2nd ed.)   "The best source for determining what makes a hypothetical correct is found in case law."   *Id.*

The ALJ's RFC is also supported by substantial evidence.  When the ALJ fails to provide a narrative discussion describing how the evidence supports each conclusion, citing to specific medical facts and nonmedical evidence, the court will conclude that her RFC conclusions are not supported by substantial evidence.  *See Southard v. Barnhart*, 72 F. App'x 781, 784-85 (10th Cir. 2003).  Here, the ALJ provided a narrative discussion describing how the evidence supported her conclusions.  Moreover, in assessing a claimant's RFC, the ALJ must consider only limitations and restrictions attributable to medically determinable impairments.  *See* SSR 96-8p, 1996 WL 374184, *2 (instructing that the RFC assessment must be based solely on limitations and restrictions attributable to medically determinable impairments).  The ALJ sufficiently explained why she found that Ms. Torres' asserted need to alternate between sitting and standing prior to her date of last insured was not supported by substantial evidence.  As such, that limitation was properly excluded from the ALJ's RFC.  *Id.*

For all of the foregoing reasons, the Court finds that the ALJ applied the correct legal standard when she posed her hypothetical to the VE and her findings were supported by substantial evidence.  The Court also finds that the ALJ's RFC was supported by substantial evidence.

### 4.   The ALJ Did Not Err In Her Analysis Regarding Ms. Torres' Transferable Skills

Ms. Torres last argues that the ALJ's analysis regarding her transferability of skills is necessarily flawed because the job title the VE identified, and upon which the ALJ relied, did not correspond to Ms. Torres' past relevant work as a telephone company manager.  (Doc. 22 at 26-27.)  Ms. Torres argues that according to the Social Security Administration's Program

Operations Manual Systems[35] DI 25015.017(D), the adoption of an incorrect job description renders the jobs the VE identified as related to her past relevant work inaccurate.  (*Id*.)  The Commissioner contends that the ALJ appropriately relied on the VE's testimony regarding Ms. Torres transferrable job skills because the VE testified she reviewed the exhibits, heard Ms. Torres' testimony, and described Ms. Torres' past relevant work as a telecommunications manager.  (Doc. 34 at 21-23.)  The Commissioner further points out that Ms. Torres' counsel, although provided an opportunity to do so, did not challenge the VE's characterization of Ms. Torres' past relevant work at the time of the hearing.  (*Id*.)

In pursuing her claim for benefits, Ms. Torres bore the initial burden of demonstrating that she had one or more severe impairments that made her unable to perform her past relevant work.  Ms. Torres met this burden.  At that point, the burden shifted to the Commissioner to establish that Ms. Torres could perform other jobs in the national economy, considering her RFC, age, education, and past experience.  *Emory v. Sullivan*, 936 F.2d 1092, 1094 (10th Cir. 1991) (citing *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988)).  An ALJ may use Medical–Vocational guidelines or "grids," found at 20 C.F.R. Part 404, Subpart P, Appendix 2, in conjunction with the claimant's RFC, age, education and work experience, at the fifth step of the disability determination, to determine whether the claimant can successfully adjust to other work.  To establish that work exists in the national economy, the ALJ can rely on evidence such as the testimony of a VE and the DOT. The ALJ takes administrative notice of reliable job information available from various governmental publications such as the DOT, published by the Department of Labor. 20 C.F.R. § 404.1566(d). The ALJ can also use the services of a VE to

---

[35] The POMS is "a set of policies issued by the Administration to be used in processing claims."  *McNamar v. Apfel*, 172 F.3d 764, 766 (10th Cir. 1999).

help determine whether a claimant's work skills can be used in other work, and, if so, the specific occupations in which they can be used.  20 C.F.R. § 404.1566(e).

"As age is one of the factors that must be considered, it should surprise no one that the [Commissioner] faces a more stringent burden when denying disability benefits to older claimants."  *Dikeman v. Halter*, 245 F.3d 1182 (10th Cir. 2001) (quoting *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990)).  If a claimant is "closely approaching advanced age (50-54), [the Commissioner] will consider that [her] age, along with a severe impairment and limited work experience, may seriously affect [her] ability to adjust to a significant number of jobs in the national economy."  *Id.* (citing 20 C.F.R. § 404.1563(c)).  The acquisition of skills that are transferable to other work, however, give a claimant "a special advantage over unskilled workers in the labor market."  SSR 82-41, 1982 WL 31389, at *2.  Indeed, Rule 201.11 of the grid shows an individual closely approaching advanced age (ages 50–55) with limited or less education, skilled or semi-skilled previous past work experience and transferable skills will be found "not disabled."  Thus, to find Ms. Torres who was closely approaching advanced age, not disabled, the ALJ was required to find that she had acquired skills in her past work that were transferable to other skilled or semi-skilled jobs.  *See* 20 C.F.R., Pt. 404, Subpt. P. App. 2, §§ 201.14, 201.15.  The ALJ did just that, and in the absence of legal error this Court will not disturb the ALJ's findings which were supported by substantial evidence.

The Commissioner has defined a skill as:

knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level (requires more than 30 days to learn).  It is practical and familiar knowledge of the principles and processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner.  This includes activities like making precise measurements, reading blueprints, and setting up and operating complex

machinery.  A skill gives a person a special advantage over unskilled workers in the labor market.

SSR 82-41, 1982 WL 31389, at *2.  A skill cannot be acquired by performing an unskilled job, and a person who has acquired skills that are not transferable to other jobs "has no special advantage."  *Id.*  An ALJ can find a claimant's acquired skills are transferable to other jobs "when the skilled or semi-skilled work activities [the claimant] did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work. This depends largely on the similarity of the occupationally significant work activities among different jobs."  20 C.F.R. § 404.1568(d)(1).  "Transferability is most probable and meaningful among jobs in which – (i) The same or lesser degree of skill is required; (ii) The same or similar tools and machines are used; and (iii) The same or similar raw materials, products, processes, or services are involved."  20 C.F.R. § 404.1568(d)(2).   There are varying degrees of transferable skills "ranging from very close similarities to remote and incidental similarities among jobs", and not all of the subsets of 1568(d)(2) need be met for skills to be transferable.  20 C.F.R. § 404.1568(d)(3).

When an ALJ makes a finding that a claimant has transferable skills, she must identify the specific skills actually acquired by the claimant and the specific occupations to which those skills are transferable.  SSR 82-41, 1982 WL 31389, at *7.  "Evidence that these specific skilled or semiskilled jobs exist in significant numbers in the national economy should be included[.]"  *Id.*  "This evidence may be [VE] statements based on expert personal knowledge or substantiation by information contained in the publications listed in [the] regulations[.]"  *Id.* "The claimant is in the best position to describe just what he or she did in [past relevant work], how it was done, what exertion was involved, what skilled or semiskilled work activities were involved, etc."  *Id.* at *4.  "Neither an occupational title by itself nor a skeleton description [of a

job] is sufficient" to document the claimant's acquisition of skills.  *Id.* at *4.  "Job titles, in themselves, are not determinative of skill level."  *Id.*

Here, Ms. Torres was fifty-three years old at the date of her last insured, so she was closely approaching advanced age for purposes of determining whether she was disabled.  As such, the ALJ's determination that Ms. Torres had transferable skills was critical to her finding that Ms. Torres was not disabled.  In this case, the record contains considerable information about Ms. Torres' past relevant work.  On May 12, 2009, Ms. Torres reported in her disability application that she had been a manager for a telephone company from "1970 - 12/2005 [sic]." (Tr. 147.)  She described that she worked with engineers to design phone equipment for public service.  (*Id.*)  She reported that she used machines, tools or equipment; she used technical knowledge or skills; and that she wrote, completed reports, or performed similar duties in her job.  (*Id.*)  Ms. Torres stated she carried tools sometimes in the course of her work.  (*Id.*) Ms. Torres represented that she was a lead worker, that she supervised from 25-30 people during the course of her day, and that she was responsible for hiring and firing employees.  (Tr. 148.)

On March 1, 2010, Ms. Torres reported that she had worked for the phone company from September 1970 to September 2000, and that her duties performed included "operator, repair and installation, manager."  (Tr. 178.)

On December 8, 2010, at the first administrative hearing in this matter before ALJ Farris, Ms. Torres testified that she was promoted to management four years after she started working with the phone company and was in management positions until she retired.  (Tr. 54.)  She testified that her work as a manager covered all of New Mexico, part of El Paso, and all the "independent companies."  (Tr. 42.)  She testified to working long hours because "when it comes to repair [and] installation, you never know what's going to go on in other states that you're

responsible for." (*Id.*)  Ms. Torres testified she preferred to be in the trenches helping the personnel and people in the field.  (*Id.*)  She testified that during her career she "did do all the outside work, climbing poles and all that" until she couldn't do it anymore.  (Tr. 47.)  Ms. Torres testified that she dealt with written documents in her job, but she also had secretaries and clerical assistants to help with that work.  (Tr. 46-47.)  She testified that she was in a "high-profile position reporting to directors, sometimes three or four, and just solely reporting to them; and then, they'd give [her] their marching orders to take out to the other states."  (Tr. 47.)  She testified that just before she retired she was "trialing" many systems coming into the state for "our corporate parts."  (*Id.*)

On August 27, 2014, at the second administrative hearing before ALJ Farris,[36] Ms. Torres testified that her first job with the phone company was a clerical position that lasted three years, but then she became a manager of different operations until she retired in September 2000. (Tr. 602.)  Ms. Torres testified that some of the different management jobs she held included staff functions for corporate headquarters in Denver, and that a lot of them involved her bringing in automated services to New Mexico.  (*Id.*)  Ms. Torres testified that she put new offices together for new functions coming in to the state, and that she would install new computers for outside technicians and dispatching units throughout the state.  (*Id.*)  Ms. Torres testified she would bring the new computers to the inside dispatcher's force, and then would travel throughout the state and train all the outside technicians.  (*Id.*)  Ms. Torres testified that her management positions required her to write reports.  (Tr. 616.)  Ms. Torres testified that her last job with the phone company was as a "manager of Los Alamos fires" when the phone company replaced all of the wiring and cables following the Sierra Grande fire.  (Tr. 601, 603.)

---

[36] ALJ Farris informed Ms. Torres at this hearing that she would be considering her testimony "at the last hearing as well as your testimony at this hearing, and the documentary evidence in your file."  (Tr. 597.)

At the hearing, the ALJ called a VE to testify about Ms. Torres' past relevant work and her transferable skills.  The testimony was as follows:

Q.      Ms. King, have you had any discussion about this with myself, the claimant, or the representative?

A.      No, your honor.

Q.      Are you aware that your testimony needs to be in accord with the Dictionary of Occupational Titles and its companion publications?

A.      Yes.

Q.      Will you tell me about any variation between you testimony and those publications?

A.      Yes, your honor.

Q.      Now have you reviewed the exhibits and heard the testimony concerning the claimant's past work?

A.      Yes.

Q.      On that basis would you please categorize her past work in terms of exertional and skill levels and give me the DOT number?

A.      Yes, your honor.  Telecommunications manager, 822.281-014,[37] light with an SVP of 7.

Q.      Okay.  Would that job have transferable skills to sedentary work?

A.      Yes, your honor.

Q.      What sort of skills?

---

[37] The DOT number corresponds to Central-Office Repairer (tel. & tel.) alternate titles: central-office maintainer and is described as "[t]ests, analyzes defects, and repairs telephone circuits and equipment in central office of telephone company, using test meters and handtools: Locates electrical, electronic, and mechanical failures in telephone switching equipment, using milliammeter boxes, schematic drawings, computer printouts, or trouble tickets. Installs, repairs, and adjusts equipment, such as switches, relays, and amplifiers, using handtools.  Removes connections on wire distributing frames and solders or splices wires to terminal lugs, following diagrams [FRAME WIRER (tel. & tel.)].  May maintain telephone switching equipment at private establishments, such as hotels and office buildings [PRIVATE-BRANCH-EXCHANGE REPAIRER (tel. & tel.)].  May diagnose, isolate, and clear electrical faults in circuit [TROUBLE LOCATOR, TEST DESK (tel. & tel.)].  When servicing equipment for intercommunity telephone lines, may be designated Toll Repairer, Central Office (tel. & tel.)."

A.     Customer service, interviewing, telephonic, ace at computer skills would probably be the main transferable skills.

Q.     Okay.  Now you said telephonic.  What do you mean by that?

A.     Able to do work via the telephone –

Q.     Okay.

A.     -- and customer service for the telephone.

Q.     All right.  So then utilizing those skills but no additional skills assuming a person could perform the requirements of sedentary work and would need to avoid exposures to pulmonary irritants including dusts, fumes, odors, and gases would there be jobs in the national economy which such a person could perform?

A.     Yes, your honor.  Okay, scheduling clerk, 221.367-026, sedentary with an SVP of 4.  Nationally in excess of 400,000.  Registration clerk, 205.367-042, sedentary with an SVP of 3.  Nationally in excess of 250,000.  And reservation clerk, 238.367-014, sedentary with an SVP of 3.  Nationally in excess of 126,000.

Q.     Now what skills would these jobs use that are transferable from her past work?

A.     The scheduling – or interviewing.  Scheduling would actually be another one, and customer service, and telephonics.

(Tr. 628-30.)

Ms. Torres argues that the VE's job identification, and the ALJ's reliance on it, is flawed because it fails to address her acquired skills, thereby making the ALJ's analysis regarding Ms. Torres' transferrable skills inaccurate.  The Court is not persuaded.  An occupational title is insufficient to establish the skill level and activities of Ms. Torres' past relevant work.  SSR 82-41, 1982 WL 31389, at * 4.  Instead, it is the claimant who is in the best position to describe just what she did in her past relevant work.  *Id.*  Here, the record provides considerable information regarding Ms. Torres' work history, her technical and computer skills, her management responsibilities, including her supervision and training skills, and her responsibilities relating to

43

hiring and firing.  Ms. Torres' tenure in these management positions to which she testified, clearly demonstrated that she had an ability to relate to people, to interview people, and had developed more than basic computer skills.  Thus, although the VE provided a DOT occupation that did not exactly match or fully account for all of Ms. Torres' acquired skills, because the VE testified about, and specifically identified Ms. Torres' additional acquired transferable skills, which were apparent from the record itself, the Court is convinced that substantial evidence supports the ALJ's finding, and that the ALJ did not err in relying on the VE's testimony.

Ms. Torres' reliance on the strict reading of POMS DI 25015.017(D) is misplaced. While this administrative policy sets out steps for determining the transferability of skills, including the identity of an occupational title, it also identifies where to look for transferable skills by considering factors such as:

- types of tasks, materials, production, processes or services

- types of tools or machines used

- composite jobs

- degree of judgment required beyond carrying out simple duties

- work-setting and/or industry; and

- the claimant's description of PRW (as opposed to the DOT description)

POM DI 25015.017(E)(1).   The policy further instructs the ALJ *not* to rely on generic occupational titles, assume that an individual acquired all the skills listed in the DOT occupation, or discount skills acquired that are not in the DOT.   *Id.*   Again, the record supports that Ms. Torres worked in the phone industry for thirty years; she repaired and installed phone systems throughout the state and managed others doing the same; she hired and fired employees; she established offices and installed computers for new phone systems coming into the state, and

trained outside technicians on those computers; she reported to phone company directors and implemented company directives; and she wrote reports.  Ms. Torres' testimony regarding her past relevant work supports the VE's finding that Ms. Torres had acquired transferable skills of customer service, interviewing, telephonic (able to work via the telephone), and computer skills. The fact that Ms. Torres had transferable skills to apply for these positions gave her an advantage over younger unskilled workers.  *See Dikeman*, 245 F.3d at 1185 (a skill gives a person a special advantage over unskilled workers in the labor market).

The ALJ also made sufficient findings in her determination involving Ms. Torres' transferability of skills.  The ALJ stated that the VE had testified that Ms. Torres' past relevant work as a telecommunications manager was skilled with a specific vocational preparation code of seven[38] and required skills of customer service, interviewing, telephonic (able to do work via the telephone), and basic computer skills.  (Tr. 587.)  The ALJ stated that the VE had identified three jobs with an SVP of at least three, meaning those jobs were more demanding than unskilled work and would take over one month and up to and including three months of specific vocational preparation to learn.  The Court has reviewed the jobs to which the VE testified Ms. Torres could transfer, and finds no error in the ALJ's reliance on the positions the VE offered.  The ALJ also correctly found that because Ms. Torres was "closely approaching advanced age" but not yet of "advanced age" during all times at issue, the regulations did not require her to find "very little, if any, vocational adjustment." (Tr. 588.)

---

[38] Specific vocational preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  1991 WL 688702 (2008).  An SVP of seven indicates a lapsed time of "[o]ver 2 years up to and including 4 years."  *Id.*

For all of these reasons, after examining the record as a whole, the Court is persuaded that the ALJ applied the correct legal standard to determine Ms. Torres' transferable skills and that the ALJ's findings were supported by substantial evidence.

### V.  Conclusion

Ms. Torres' Motion to Reverse or Remand for Rehearing is **DENIED.**

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**